[No. H029507. Sixth Dist. Mar. 28, 2007.]

In re BRANDEE TRIPP on Habeas Corpus.

**COUNSEL**

Law Offices of Adrian T. Woodward, Adrian T. Woodward; Law Offices of Richard D. Pfeiffer and Richard D. Pfeiffer for Petitioner BranDee Tripp.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill, Denise A. Yates and Elizabeth S. Kim, Deputy Attorneys General, for Respondent State of California.

**OPINION**

**DUFFY, J.—**

## INTRODUCTION

At issue in this case is whether petitioner BranDee Tripp is entitled to a parole release date. She is currently in prison because, on July 8, 1979, 10-year-old Tameron Carpenter was strangled to death by Hilton Tripp and Randy Cook. At the time, petitioner, born in March 1959, was Hilton's wife and the mother of his child. In February 1981, petitioner was convicted by guilty plea of second degree murder and was sentenced to prison for 15 years to life. (Pen. Code, § 187.)[1] Under the plea agreement, other charges were

---

[1] Unspecified code section references are to the Penal Code.

dismissed, and petitioner agreed to testify against the man who solicited this murder, William Record, petitioner's stepfather.[2]

After a hearing on May 17, 2004, California's Board of Prison Terms[3] determined that petitioner, then age 45, was entitled to a parole date, as she "is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board had previously found petitioner suitable for parole after a hearing on November 6, 2002, and that decision was reversed on April 4, 2003, by Governor Davis.

The overarching concern of the Board in granting a prisoner a parole release date is whether "consideration of the public safety requires a more lengthy period of incarceration for this individual." (§ 3041, subd. (b).) A parole date should be denied if "the prisoner will pose an unreasonable risk of danger to society if released from prison" (Cal. Code Regs., tit. 15, § 2402, subd. (a)),[4] in other words, if the prisoner is "a continuing danger to the public." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1084 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*).)

Governor Arnold Schwarzenegger (Governor) reviewed the May 2004 grant of a parole date and, on October 14, 2004, reversed it, asserting his belief that petitioner "would pose an unreasonable threat to public safety if released from prison at this time."

Petitioner has challenged the Governor's decision by a habeas corpus petition, which the Monterey County Superior Court denied in September 2005. In August 2006, this court issued an order to show cause asking the parties to further discuss "whether some evidence supports the Governor's determination that petitioner poses an unreasonable threat to public safety considering her actual role in the murder and her progress in prison."[5] After

---

[2] Eventually, Cook pleaded guilty to first degree murder and was sentenced to 25 years to life. Hilton Tripp received the same sentence after a jury convicted him of first degree murder and conspiracy to murder. After petitioner testified against Record, he was convicted of second degree murder and was sentenced to 15 years to life.

[3] As of July 1, 2005, the Board of Parole Hearings replaced the Board of Prison Terms. (Gov. Code, § 12838.4; Pen. Code, §§ 5075, 5075.1.) We will use "Board" to refer to these successive entities.

[4] All further references to regulations (Regs.) are to the California Code of Regulations, title 15.

[5] Petitioner's habeas corpus petition also presented other issues that we did not ask the parties to brief, such as that the parole denial violated the ex post facto clause and breached petitioner's plea bargain and that the Governor did not personally review her case. This court has rejected similar plea bargain arguments. (*In re DeLuna* (2005) 126 Cal.App.4th 585, 598–599 [24 Cal.Rptr.3d 643] (*DeLuna*); *In re Honesto* (2005) 130 Cal.App.4th 81, 92 [29 Cal.Rptr.3d 653]; *In re Lowe* (2005) 130 Cal.App.4th 1405, 1422–1426 [31 Cal.Rptr.3d 1].)

reviewing the administrative record under a deferential standard, we will conclude that there is some evidence supporting the Governor's decision and will deny the habeas corpus petition.

## STANDARDS OF REVIEW

■ In this case it is important to establish the applicable standard of review before stating the critical facts available in the record. Whether a prison inmate is entitled to release on parole is an inherently subjective determination (*Rosenkrantz, supra*, 29 Cal.4th at p. 655; *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 9 [60 L.Ed.2d 668, 99 S.Ct. 2100]) that should be guided by a number of factors, some objective, identified in section 3041 and in the Board's regulations. (Regs., §§ 2281, 2402.)[6] "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8, subd. (b).) The Governor's decision is based on "materials provided by the parole authority." (§ 3041.2, subd. (a).) "Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the Board's decision." (*Rosenkrantz, supra*, 29 Cal.4th at pp. 660–661.) Since parole unsuitability factors need only be found by a preponderance of the evidence, the Governor is free to consider facts apart from those found true by a jury or judge beyond a reasonable doubt. (*Id.* at p. 679; cf. *In re Morrall* (2002) 102 Cal.App.4th 280, 302 [125 Cal.Rptr.2d 391].)

■ *Rosenkrantz* concluded "that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) After further discussion (*id.* at

The California Supreme Court has rejected an ex post facto argument. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 636–652 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)

[6] The same parole suitability criteria are listed in Regulations section 2281 and section 2402, with the latter applying to murders like this one committed after November 8, 1978. The text of these regulations is fully quoted in several cases. (E.g., *In re Scott* (2005) 133 Cal.App.4th 573, 592–593 [34 Cal.Rptr.3d 905] (*Scott II*); *In re Lee* (2006) 143 Cal.App.4th 1400, 1406, fn. 2 [49 Cal.Rptr.3d 931].) We quote relevant parts below.

pp. 658–667); the California Supreme Court concluded that the same standard applies to judicial review of a Governor's parole suitability decision. Judicial "review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the Board." (*Id.* at p. 667.) We are bound by these determinations of our standard of review. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

We note that *Rosenkrantz* identified a prisoner's conditional liberty interest in a parole release date as arising under California's Constitution. (*Rosenkrantz, supra*, 29 Cal.4th. at p. 655.) According to the Ninth Circuit, the "some evidence" standard is also settled federal law in reviewing California's parole suitability determinations. (*Sass v. California Bd. of Prison Terms* (9th Cir. 2006) 461 F.3d 1123, 1129.)

*Rosenkrantz* emphasized that this standard of evidentiary review "is extremely deferential." (*Rosenkrantz, supra*, 29 Cal.4th at p. 665.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor." (*Id.* at p. 677.) On the other hand, the evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. (*Ibid.*; *In re Lee, supra*, 143 Cal.App.4th at p. 1408.) It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. (E.g., *DeLuna, supra*, 126 Cal.App.4th at p. 597 [Board concluded, contrary to psychological evaluations, that inmate needed therapy, and faulted inmate facing deportation for failing to learn English]; *Scott II, supra*, 133 Cal.App.4th at pp. 597–603 [Governor was wrong about inmate's history of violent crime and the nature of the commitment offense]; *In re Lee, supra*, 143 Cal.App.4th at pp. 1411–1414 [Governor overstated seriousness of commitment offense and wrongly faulted inmate for late acceptance of responsibility].)

If we were reviewing a trial court's habeas corpus findings based on documentary evidence without an evidentiary hearing, we would independently review the record. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) However, the Governor's interpretation of a documentary record is due deference. So long as the Governor's interpretation of a document is reasonable, it is not for us to say that he should have adopted another interpretation, though equally reasonable. We confine our review to the evidence of unsuitability credited by the Governor and do not consider unsuitability factors apparently

discounted by the Governor. (*In re Elkins* (2006) 144 Cal.App.4th 475, 493 [50 Cal.Rptr.3d 503]; cf. *DeLuna, supra*, 126 Cal.App.4th at pp. 593–594.)

## THE GOVERNOR'S DECISION

The Governor reversed the Board in a two-and-one-half page, single-spaced, typed decision. It narrows our review to identify what is not in issue. The Governor recognized that, during petitioner's 23 years in prison, while she initially violated some rules, for the last 16 years she has obeyed the rules and made consistent and commendable progress in terms of education, vocations and therapy.[7]

The Governor's decision was not based on prison misconduct by petitioner, her lack of rehabilitation, or any prior criminal history. He noted, "Despite a turbulent pre-prison history, which included verbal, emotional, and sexual abuse, substance abuse, and prostituting herself, [petitioner] had no criminal record at the time of Tameron's murder."[8] Contrary to the Attorney General's suggestion, we do not understand the Governor to have relied on petitioner's preoffense behavior as evidence of unsuitability.

The Governor's parole denial is based entirely on the commitment offense. He explained, "after carefully considering each of the factors the Board is required to consider, the gravity of the murder [petitioner] perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole." The Governor stated that petitioner "helped plan the kidnap and murder of a 10-year-old child. And she did so for money and to help an

---

[7] The Governor noted the following: "Now 45 years old, Mrs. Tripp has been incarcerated for more than 23 years. While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release. She completed her GED and has obtained vocational certificates in word processing and forklift operation. She has participated in a number of self-help and therapy programs, including Women Against Abuse, the Relapse Prevention Program, Breaking Barriers, Anger Management, and Alcoholics Anonymous and Narcotics Anonymous consistently since 1988. She has received laudatory reports from various prison staff for her volunteer and self-help activities as well as receiving favorable Life Prisoner and mental-health evaluations. She has also established and maintained seemingly solid relationships with her mother and her daughter and has viable parole plans that include residence at a licensed treatment facility for recovering addicts and a job offer from a family friend."

[8] Although the Governor's decision does not elaborate, the sexual abuse to which he refers was obviously the molestation of petitioner by her stepfather, William Record, beginning at the age of seven.

accused child molester by eliminating Tameron so she could not testify against him." We further consider the Governor's understanding of the commitment offense in the next sections.

## THE COMMITMENT OFFENSE

There is no dispute that the murder occurred as broadly outlined in the Governor's decision. "On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death. Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both Tameron and Ms. Maddocks. To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks. Mr. Tripp, his 20-year-old wife, Bran[D]ee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks. That plan failed. They then decided to kidnap and kill young Tameron.

"Mrs. Tripp was a family friend and had access to Tameron. On the day of the murder, she arranged to take Tameron on a swimming trip. Before the trip, she asked Tameron to go to the store and pick up some drinks. Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted. The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living. They took Tameron into the Tripps' tent, tied her up, and placed cord from the tent around her neck. Mr. Tripp pulled on one side while Mr. Cook pulled on the other—until Tameron died. They then buried her in a grave that they had dug near the tent."

"When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts. Mr. Tripp, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried. Mrs. Tripp was arrested the next day. And Mr. Cook later surrendered to the police."

To establish petitioner's role in the murder, the Governor considered some of petitioner's later statements as follows. "Mrs. Tripp maintains that she did not intend for Tameron to be killed. During her 2004 parole hearing, she told the Board that her husband 'promised me that no one would get hurt' and that 'In my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken.' But at that same hearing, she admitted to suggesting various ways to kill Tameron, and explained, 'I guess that's why I ended up being considered the person in charge.' In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be

involved in the physical abduction of Ms. Maddocks—but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder." Petitioner acknowledged that she could have prevented the murder. "[D]uring her 2004 parole hearing, she said that she tried calling the police twice on the day of the murder but failed to do so because she was 'scared.' "

The Governor concluded, "The manner in which this crime was planned and carried out—particularly against one so young and vulnerable—demonstrates exceptional depravity and an utterly callous disregard for human life and suffering."

## PETITIONER'S ROLE IN THE COMMITMENT OFFENSE

Petitioner objects to the Governor's conclusion that she "helped plan the kidnap and murder" and that she was involved in the decision "to kidnap and kill" Tameron. Petitioner focuses on her role in the conspiracy that led to Tameron being kidnapped and killed by petitioner's husband and his friend. As quoted above, the Governor's conclusion about petitioner's role is based on her statements at the May 2004 parole hearing, so we focus on those statements.

This topic was discussed twice at the parole hearing. Initially, petitioner stated: "In the beginning, I was actually running interference with [sic] her. Because they were talking and they wanted to kill her. I didn't want to kill her. I didn't want to help kill her. . . . Well, the day that this happened, before it happened, my husband promised me that no one would get hurt. He promised me that he would go pick Tammy up if I sent her down to the store. I could go to [Cook's] house and watch her, and they would go convince my stepfather that they kidnapped her and she wouldn't be testifying to get the money. And then we were going to let her go." It was only as petitioner kept waiting for them at Cook's house that she realized something had gone awry.

Later at the hearing, the presiding commissioner stated: "Says in the 1999 psychiatric evaluation, [petitioner] admits that she and her husband discussed both Tam[e]ron and her sister. Moreover, [petitioner] and her husband looked at, you know—He says, it is not credible that she did not know that

Tam[e]ron would be killed because you had discussed her being killed with your husband prior to this."[9]

Petitioner responded: "I was part of—I can't take myself out of the conversation. I was there when—All four of us were actually there when the conversations were taking place. I didn't help the matters. I know today that I probably helped them more than I really liked to. I didn't help stop the matters and it was a discussion that I was on the side of no, let's not do it that way. No, let's not do it that way. Let's try to do it this way. And I guess that's why I ended up being considered the person in charge. Pretty much, they think I was the overseer of the whole thing and there was really nothing I could do about that. Because that's how they see that, but I was always trying to run interference. And then when he promised me that they wouldn't hurt her, then I became more willing to go along with it because I didn't know that (inaudible.) And then I became afraid to act on it. I was too afraid to do anything. I didn't really want to believe that my husband would kill anyone anyway, because they didn't do anything with Betty Ann. . . . He promised me he's going to do that and I just talked myself into believing that he wouldn't kill anyone."

Having studied these statements closely, we conclude that they are reasonably susceptible to the Governor's interpretation. Petitioner's statements at the parole hearing fall short of a claim that she told her husband in no uncertain terms that she opposed killing Tameron. Petitioner stated that she "did not want to help kill her." This could mean that she did not share the criminal intent required for an aider and abettor (cf. *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107 [17 Cal.Rptr.3d 710, 96 P.3d 30] [aider and abettor is liable for natural and probable consequences of target crime]; *People v. Prettyman* (1996) 14 Cal.4th 248, 261 [58 Cal.Rptr.2d 827, 926 P.2d 1013] [same]), but it also could mean only that she would not personally participate in the actual murder. Even if petitioner proposed alternatives to killing Tameron, she did not say she unequivocally disavowed the fatal option. She said she "became more willing to go along with" the plan when

---

[9] In the 1999 evaluation, Dr. McDaniel reported asking petitioner if there was ever talk about killing Tameron. Petitioner stated that her husband talked about it one night while smoking marijuana. He talked about shooting people from a distance. She told him it was not right to shoot someone.

The evaluation noted that there was a "police report" in the central file alluding to a witness who stated that petitioner had discussed killing a potential victim. This police report does not appear in the record we have, unless it is a misdescription of the 1981 probation report. That probation report quotes statements by Roger Ladd that he participated in a conversation in which petitioner and her husband thought up a half a dozen ways to kidnap and kill Tameron. The Attorney General has also invoked this probation report, but the Governor did not rely on it.

her husband promised not to hurt Tameron. This suggests some initial acquiescence to the fatal alternative.[10]

■ Although the Governor simply reviewed the documents before the Board, he was free to make his own credibility determinations. If he had chosen to disbelieve petitioner, we would be bound by that determination. (*Rosenkrantz, supra,* 29 Cal.4th 626, 665, 677.) Contrary to the Attorney General's oral argument, we do not understand the Governor to have disbelieved petitioner. Instead, he found and believed that she admitted helping to plan Tameron's murder. We conclude that this is a reasonable interpretation of petitioner's somewhat ambiguous and unclear statements at her parole hearing. When undisputed facts in an administrative record give rise to conflicting inferences and support equally reasonable interpretations, our appellate function requires us to defer to the fact finder's interpretation. (Cf. *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74–75 [227 Cal.Rptr. 667, 720 P.2d 15]; *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774, fn. 2 [163 Cal.Rptr. 619, 608 P.2d 707]; *Yordamlis. v. Zolin* (1992) 11 Cal.App.4th 655, 659–660 [14 Cal.Rptr.2d 225].)[11] ■ There is thus some evidence that petitioner participated in planning not only the kidnapping, but the 1979 murder, of Tameron. This evidence also supports the Governor's conclusion that petitioner, at age 45, remained dangerous to public safety.

### REPEATED RELIANCE ON COMMITMENT OFFENSE

Petitioner further argues that she has been denied due process by the Governor denying her parole based solely on the immutable circumstances of her commitment offense.

■ A person who commits the kind of crime subject to an indeterminate life prison term almost always poses an unreasonable risk of danger to society at the time of the crime.[12] The "timing and gravity" of the circumstances of that crime may remain probative of an inmate's current dangerousness many years later. (§ 3041, subd. (b).) The California Supreme Court has

---

[10] We do not intend to suggest that her use of the word "more" in this context is why petitioner deserves continued incarceration. Other parts of her statement, in the absence of further explanation, also appear to suggest a reluctant acquiescence to murder.

[11] At least after *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839], appellate courts have not been similarly deferential to trial courts when the issue is interpretation of a written instrument unaided by extrinsic evidence (*id.* at pp. 865–866), but that situation involves different jurisprudential concerns than the reading of a transcript.

[12] Among the crimes subject to an indeterminate life sentence are certain types of gang crimes (§ 186.22, subd. (b)(4)), murder (§ 190), attempted premeditated murder (§ 664, subd. (a)), gross vehicular manslaughter while intoxicated (§ 191.5), aggravated sexual assault on a child (§ 269), aggravated arson (§ 451.5), aggravated sex offenses (§ 667.61), certain

concluded that the " 'nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole.' " (*Dannenberg, supra*, 34 Cal.4th 1061, 1094, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 682.) One indicator of parole unsuitability is that "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1).)[13] The *Dannenberg* majority decided that the Board and Governor can find he commitment offense to be especially heinous, atrocious or cruel so long as the crime involved elements beyond " 'the minimum necessary to sustain a conviction for that offense,' " without comparing the crime to other similar crimes. (*Dannenberg, supra*, 34 Cal.4th at pp. 1094–1095, 1098.)

■ Establishing that the commitment offense involved some elements more than minimally necessary to sustain a conviction is a step on the path of evaluating a prisoner's current dangerousness, but it is not the final step under the regulations. Due process affords an inmate "an individualized consideration of all relevant factors." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 655.)

■ As *Scott II, supra*, 133 Cal.App.4th 573 explained at pages 594–595, the proposition that the commitment offense alone may establish unsuitability for release "must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (*In re Smith* (2003) 114 Cal.App.4th 343, 372 [7 Cal.Rptr.3d 655]), and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' (*Biggs v. Terhune* [(9th Cir. 2003)] 334 F.3d [910,] 917.) The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. (*Irons v. Warden of California State Prison—Solano* (E.D.Cal. 2005) 358 F.Supp.2d

---

types of kidnapping (§§ 209, 209.5), and various recidivist felony offenses (§§ 667, subd. (e)(2)(A), 667.51, subd. (c), 667.75, 1170.12, subd. (c)(2)(A)).

[13] The full regulation states: "The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Regs., § 2402, subd. (c)(1).)

936, 947, fn. 2.)[14] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny. '[T]he gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, *so long as the Board does not fail to consider all other relevant factors.*' (*In re Ramirez* [(2001)] 94 Cal.App.4th [549,] 569 [114 Cal.Rptr.2d 381], latter italics added; accord, *Rosenkrantz, supra,* 29 Cal.4th at pp. 660, 677; *[In re Scott* (2004)] 119 Cal.App.4th [871,] 891 [15 Cal.Rptr.3d 32].)" (Fns. omitted.)

Under the regulations applicable to evaluating an inmate's current dangerousness, the viciousness of the commitment offense must be balanced against the passage of time and any evidence of an inmate's rehabilitation. Among the indicators of parole suitability are: "(7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d).)

Relying on dictum in *Biggs,* petitioner asserts that it is a denial of due process to interminably deny her parole based solely on her commitment offense. Petitioner asserts at one point in her petition that she has "endured *fourteen* parole denials by [Board] panels and governors *based on her commitment offense.*" (Original boldface.) At another point, she claims that, "At **twelve** parole hearings between 1986 and 2001, [Board] panels found petitioner unsuitable for parole based largely or entirely on her commitment offense." (Original boldface.) Petitioner offers to provide the transcripts of these prior hearings on request. The only hearing for which she has provided a transcript is the latest one. This offer falls short of adequately documenting this contention. (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252].)

In any event, in the latest decision denying parole, it appears that the Governor has provided petitioner with an individualized consideration of the relevant factors. We have quoted above (in fn. 7, *ante,* at p. 314), his recognition of several factors favoring petitioner's parole, including numerous rehabilitative efforts in prison. Petitioner cites no factor as overlooked by the Governor. Her real disagreement is with the weight he attached in 2004 to her 1979 behavior. But the Governor was authorized to independently review the evidence before the Board that granted her a parole date. On the existing record, we cannot say that due process required the Governor to strike a different balance.

---

[14] The Ninth Circuit recently reversed this district court decision in *Irons v. Carey* (9th Cir. 2007) 479 F.3d 658.

## DISPOSITION

The petition for writ of habeas corpus is denied.

Premo, Acting P. J., and Mihara, J., concurred.

On April 26, 2007, the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied August 15, 2007, S152032.